UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROSEMARY CHATTELLE, | ) |
| MICHAEL CHATTELLE, | ) |
|    Plaintiffs | ) |
| | ) |
| vs. | ) |
| | )  C.A. No.  03-12239 MAP |
| VIRIATO M. FIALLO, M.D.; | ) |
| BAYSTATE MEDICAL CENTER; | ) |
| HUBBARD REGIONAL HOSPITAL; | ) |
| LUIGI QUERUSIO, M.D. | ) |
|    Defendants | ) |

<u>DEFENDANT, VIRIATO M. FIALLO, M.D.'S, DESIGNATION OF EXPERT WITNESSES</u>

Now comes the defendant, Viriato M. Fiallo, M.D., and through counsel, designates the following expert witnesses who may be called to testify at trial in this matter.

The following are anticipated to testify regarding the standard of care, causation, and/or damages of Rosemary Chattelle at times pertinent to this action.

1.      Stephen J. Ferzoco, M.D.
        18 Benvenue Street
        Wellesley, MA  02482

Pursuant to Fed. R. Civ. P. 26(2)(B), please refer to the report of Stephen J. Ferzoco, M.D. attached as Exhibit 1.

2.      Philip C. Carling, M.D.
        Department of Infectious Diseases
        Caritas Carney Hospital
        Dorchester, MA

Pursuant to Fed. R. Civ. P. 26(2)(B), please refer to the report of Philip C. Carling, M.D. attached as Exhibit 2.

Dr. Carling has also testified in the following cases:  <u>Keiler v. LaBarge</u>, Essex Superior Court, Civil Action No. 99-1250 and <u>Schock v. Cua</u>, Norfolk Superior Court, Civil Action No. 00-995B.

The defendant, Viriato Fiallo, M.D., will present evidence that at all times relevant to his involvement in the treatment of Ms. Chattelle, he complied with the standard of care of the average qualified physician practicing general surgery and that nothing he did or is alleged not to have done caused any worsening of her condition or alleged injuries.  The doctor is expected to provide testimony regarding the treatment and examination he provided to Ms. Chattelle.  This testimony is expected to be in accordance with his deposition testimony, discovery and the

medical records. The doctor is expected to present testimony regarding the significance of his examinations, clinical findings, differential diagnosis and treatment plan. The testimony is expected to be in accordance with the expert medical testimony identified above. The testimony is also expected to be in accordance with the testimony provided in his deposition. The factual basis of such testimony is the defendant's education, training and experience, as well as his contact with the plaintiff and his personal knowledge of his treatment, as well as his observations regarding the plaintiff's complaints and symptoms at various times.

The defendant reserves the right to obtain expert testimony from any of the plaintiff's treating physicians identified in the medical records. The defendant also reserves the right to elicit expert testimony from any of the plaintiff's treating physicians from any of her healthcare providers. As no contact has been made with any of these persons, it is unknown what testimony they may provide. It is expected that such testimony would be in accordance with what is contained in their respective medical records.

The defendant reserves the right to supplement this expert disclosure. The defendant specifically reserves the right to supplement this list and substance of expected testimony based on any newly disclosed expert testimony regarding the treatment or condition of the plaintiff or any of her medical treatment, alleged negligence, causation, and damages.

The defendant also reserves the right to supplement this disclosure regarding expected expert trial testimony based on any newly discovered facts or expert opinions disclosed by the plaintiffs at the time of trial or before. In addition, the defendant incorporates by reference the expert witness disclosure of the co-defendant, Luigi Querusio, M.D. The defendant, through counsel, reserves the right to elicit expert medical testimony from the co-defendant's expert witnesses in accordance with the co-defendant's expert disclosure on behalf of Dr. Fiallo.

Respectfully submitted,


/s/ Kevin C. Reidy,
Kevin C. Reidy, B.B.O. No.: 567760
Attorneys for Defendant, Viriato M. Fiallo, M.D.
Martin, Magnuson, McCarthy & Kenney
101 Merrimac Street
Boston, MA  02114
(617) 227-3240



<u>CERTIFICATE OF SERVICE</u>

I, Kevin C. Reidy, counsel for the defendant, Viriato M. Fiallo, M.D., hereby certify that on the 14th day of July, 2006, I served the above **EXPERT DISCLOSURE** by electronically forwarding a copy to David P. Angueira, Esq., Swartz & Swartz, 10 Marshall Street, Boston, MA  02108; Allison K. Blew, Esq., Foster & Eldridge, 955 Massachusetts Avenue, Cambridge, MA  02139; and Brent A. Tingle, Esq., Morrison, Mahoney & Miller, 10 Chestnut Street, Worcester, MA  01608.

/s/ Kevin C. Reidy,
Kevin C. Reidy, B.B.O. No.: 567760
Attorneys for Defendant, Viriato M. Fiallo, M.D.
Martin, Magnuson, McCarthy & Kenney
101 Merrimac Street
Boston, MA  02114
(617) 227-3240

EXHIBIT 1

REPORT OF STEPHEN J. FERZOCO, M.D
PURSUANT TO FED. R. CIV. P. 26(2)(B)

I.    STATEMENT OF THE OPINIONS TO BE EXPRESSED AND THE BASIS AND
      REASONS FOR OPINIONS

Dr. Fiallo was involved in the care of Ms. Chattelle when she presented with a rectovaginal fistula. Both Drs. Charles and Fiallo took Ms. Chattelle to the operating room on December 13, 2000. Dr. Charles repaired her rectovaginal fistula while Dr. Fiallo performed a laparoscopic sigmoid colostomy. According to the records, there were no intraoperative complications to that procedure. On February 1, 2000, Dr. Fiallo took Ms. Chattelle back to the operating room for colostomy closure. According to the records, there were no complications or difficulties during the course of surgery. However, during her postoperative course, she developed fever, erythema, and drainage from her wound. After a bedside wound exploration failed to improve her condition, she was taken back to the operating room on February 8, 2001. Her abdominal wall was felt to be the source of her infection and the wound was debrided. According to the records, the intra-abdominal contents were intact with no evidence of infection or leakage of bowel contents. She had subsequent surgery over the next few days to further debride non-viable tissue. She was eventually discharged from the hospital to a transitional care facility.

Dr. Querusio first met Ms. Chattelle on March 3, 2001 in the Emergency Department of Hubbard Regional Hospital. At the time of his initial consultation, Ms. Chattelle was reported to be septic and tachycardic. Her abdomen revealed multiple surgical scars which were partially closed, the midline scar was open partially, and there was a left lower quadrant oblique scar as well. There was fecal drainage from the open part of the midline wound. She was very tender on exam. Dr. Querusio's impression at the time of his initial consultation was an anastomotic leak with fecal peritonitis.

Dr. Querusio's plan was to perform emergency surgery with probable take down of the anastomosis, temporary colostomy, and closure of the abdominal wall as best as possible, considering her extensive debridement of her abdominal musculature and fascia from her previous surgery. A discussion of his operative plan was had between Dr. Querusio, the patient and her husband and consent was obtained.

At the time of her emergency laparotomy, feces was emanating from the left lower quadrant. The colostomy scar in the left lower quadrant was reopened as well. A phlegmon was seen in the left lower quadrant with feces emanating from a hole at the anastomosis. The previous anastomosis and segment of colon with the leak was excised and a colostomy was brought up through her left upper quadrant. Multiple drains were then placed along the pelvis and gutter and the abdomen partially closed.

Mrs. Chattelle's subsequent postoperative course was noted for persistent drainage from an abdominal wound. Further workup revealed this to be fistula from the rectal stump staple line.

Dr. Fiallo's care and treatment of Ms. Chattelle complied with the standard of care of the average qualified physician practicing general surgery in November of 2000 to March of 2001.

Dr. Fiallo's initial choice of diverting colostomy for her rectovaginal fistula was certainly appropriate and within the standard of care. The need to divert her fecal stream to allow her rectovaginal fistula repair to heal was necessary. Dr. Fiallo obtained the appropriate history from the patient and performed the appropriate pre-operative work up. The appropriate informed consent was obtained. Dr. Fiallo performed the December 13, 2000 surgery in compliance with the appropriate surgical technique and in compliance with the standard of care. Dr. Fiallo waited the appropriate length of time before scheduling the patient's colostomy takedown. The surgery performed by Dr. Fiallo on February 1, 2001 was performed in accordance with the standard of care.

That Mrs. Chattelle developed post-operative wound infection and necrotizing fasciitis was an unfortunate, unexpected and unpreventable complication of the colostomy reversal procedure. There is no evidence that there was any negligent conduct or that any negligent conduct caused or contributed to the development of post-operative infection with Mrs. Chattelle. Dr. Fiallo appropriately recognized the wound infection, attempted a bedside debridement and probing of the wound. When her condition deteriorated, Dr. Fiallo appropriately took the patient to the operating room and performed the necessary procedures. Dr. Fiallo appropriately inspected the abdominal contents and found that the infection was localized to the superficial tissues above the fascia. Wide, aggressive debridement was needed for her to survive her infection. Dr. Fiallo appropriately managed and treated Mrs. Chattelle from a surgical perspective while she was admitted at BayState Medical Center. There was no delay in the treatment of the post-operative infection. Dr. Fiallo performed the appropriate evaluations and treatment. Other than what was performed, there was no need for further diagnostic testing or surgery. Based upon the medical records, the anastomosis was intact upon the patient's discharge from the BayState Medical Center. The patient was appropriately discharged to a transitional care center in stable condition.

Dr. Querusio managed her anastomotic leak appropriately. The doctor recognized her tachycardia and sepsis and promptly took her to the operating room for emergency surgery. When an anastomotic leak was identified, the doctor correctly diverted the patient and excised the diseased segment of colon. The fact that she developed a leak and fistula from her rectal stump is a known and accepted complication of the surgery which he performed. In addition to recognizing the injury, he wisely decided to treat it conservatively before sending her to a colorectal expert in Boston for definitive repair.

Based upon the above information, as well as my education, training and experience it is my opinion that Dr. Fiallo complied with the standard of care of the average qualified physician, practicing general surgery from November 2000 to March 3, 2001. Based upon the above information, as well as my education, training and experience, it is my opinion that nothing Dr. Fiallo did or is alleged not to have done caused or contributed to the patient's alleged injuries. My opinions are held to a reasonable degree of medical certainty.

I also expect to present expert testimony generally relating to the surgeries involved in this case, colostomies, wound infections and surgical treatment of wound infections, the anatomy involved in this case, treatment options and specifically as they pertain to the allegations in this case. I also expect to present testimony based upon the medical records that have been obtained in this case and to testify regarding the significance of the information contained in the medical records pertaining to the patient's prior and subsequent medical condition.

I also expect to present expert medical testimony to refute the testimony of plaintiffs' medical witnesses and the opinions identified in Dr. Dolin's letters.

In summary, Drs. Fiallo and Querusio complied with the standard of care of the average qualified general surgeons at the time of their treatment of Mrs. Chattelle. Although Mrs. Chattelle did develop several complications along the course of her care, there was never an example of negligence in their treatment. Accordingly, the defendants did not cause or contribute to cause the plaintiff's alleged injuries. The complications experienced by the plaintiff were merely an unfortunate and unpreventable medical occurrence and not the result of any negligence.

II.    DATA OR OTHER INFORMATION CONSIDERED IN FORMING THE OPINIONS OUTLINED ABOVE

My testimony and opinions are based on my education, training and experience, as well

as my review of following records:

> Deposition of Viriato Fiallo, M.D.;
> Deposition of the Defendant, Luigi Querusio, M.D.;
> Depositions of Rosemary and Michael Chattelle;
> Office records of Dr. Viriato Fiallo;
> Baystate Medical Center records;
> Hubbard Regional Hospital records;
> Brigham and Women's Hospital records;
> Office records of Ronald Bleday, M.D.;
> Office records of Valley Women's Health Group;
> Tri-State Rehabilitation Center records;
> Moldex records;
> Social Security Services Disability Claims records;
> Woodstock Medical Group records (Dr. Lau);
> Letters from Bernard Dolin, M.D.;
> Defendants' Answers to Interrogatories;
> Plaintiffs' Answers to Interrogatories;
> VNA of Southern Worcester County records; and
> Connecticut VNA records;

III.    ALL EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR THE OPINIONS OUTLINED ABOVE

Other than the records identified in Section II above, a determination has not been made

as to what, if any, additional exhibits may be used as a summary of or to support my opinion.  I

reserve the right to review and identify any additional materials that may be used at trial in this

matter by any party.

IV.    THE QUALIFICATIONS OF THE WITNESS, INCLUDING A LIST OF ALL
       PUBLICATIONS AUTHORED WITHIN THE LAST TEN YEARS

       Please see curriculum vitae attached hereto.

V.     THE COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY

       My fee is $350.00 per hour for time spent evaluating the records and time spent
testifying.

VI.    A LISTING OF OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT
       WITHIN THE PRECEDING FOUR YEARS

       Rosenaur v. James Wood, M.D., District Court of Limestone County, Texas, Deposition
       November 21, 2005

                                    _____
                                    Stephen J. Ferzoco, M.D.

Dated: _____7/12/06_____

# *Curriculum Vitae*

**Name:**    Stephen John Ferzoco, M.D.

Home Address:    18 Benvenue Street
Wellesley, MA  02482
781-416-1960

Business Address:    75 Francis Street
Boston, MA  02115
617-732-6819

Email:    sferzoco@partners.org

Date of Birth:    September 2, 1966

Place of Birth:    Norwood, MA

Social Security:    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

## Education:

1988 B.S.    Tufts Univeristy
1993 M.D.    Yale University School of Medicine

## Postdoctoral Training:

Intership and Residencies:
1993-1994    Intern in Surgery, Brigham and Women's Hospital, Boston, MA
1994-1995    Resident in General Surgery, Brigham and Women's Hospital
1997-1999    Resident in General Surgery, Brigham and Women's Hospital
1999-2000    Chief Resident in General Surgery, Brigham and Women's
Hospital

## Fellowships:

1996-1997    Reseach Fellow in Cardiac Surgery, Brigham and Women's
Hospital, Harvard Medical School, Boston, MA

## Licensure and Certification:

1993    Advanced Cardiac Life Support
1994    Diplomate Nation Board of Medical Examiners
1994    Massachusetts Medical License - 80708
2000    Advanced Trauma Life Support

2001            American Board of Surgery

## Academic Appointments:

| | |
|---|---|
| 1993-1995 | Clinical Fellow in Surgery, Harvard Medical School |
| 1995-1997 | Clinical/Research Fellow in Surgery, Harvard Medical School |
| 1997-2000 | Clinical Fellow in Surgery, Harvard Medical School |
| 2000- | Instructor in Surgery, Harvard Medical School |

## Administrative Responsibilities:

| | |
|---|---|
| 2000- | Associate Director, Level 1 Trauma Center, Brigham and Women's Hospital |
| 2000- | Associate Program Director, Residency Training Program, Department of Surgery, Brigham and Women's Hospital |

## Awards and Honors

| | |
|---|---|
| 1987 | Phi Beta Kappa |
| 1987 | Honorable Mention for "Outstanding Summer Student Award" at the National Institutes of Neurologic and Communicative Disorders and Stroke at the National Institutes of Health |
| 1988 | Magna Cum Laude (Biology and Classics) |
| 1988 | Outstanding Summer Student Award at the National Institutes of Neurologic and Communicative Disorders and Stroke at the National Institutes of Health |
| 1989 | Outstanding Summer Student Award at the National Institutes of Neurologic and Communicative Disorders and Stroke at the National Institutes of Health |
| 1991 | Recipient of the American Heart Association One-Year Student Research Fellowship 1991 |
| 1991 | Outstanding Paper of the Afternoon at the Annual Meeting of the Connecticut Society of American Board Surgeons & Connecticut Chapter of the American College of Surgeons |
| 1992 | Annual Resident Research Award at the 16th Annual Surgical Symposium of the Association of Veteran Administration Surgeons |
| 1992 | Outstanding Paper of the Afternoon at the Annual Meeting of the Connecticut Society of American Board Surgeons & Connecticut Chapter of the American College of Surgeons |
| 1993 | Farr Scholar Yale University School of Medicine |
| 1993 | University Honors for Medical School Thesis |
| 1993 | Association of Academic Surgeons Student Research Award |
| 1996 | Medtronic Research Fellow in the Division of Cardiothoracic Surgery, Brigham and Women's Hospital, Harvard Medical School |

1997          John A. Mannick Research Award, Brigham and Women's
              Hospital, Harvard Medical School

**Major Committee Assignments:**

1998-1999     Partners Education Committee
2000-         Department of Surgery Education Committee, Brigham and
              Women's Hospital
2000-         Assistant Director, Trauma Service, Department of Surgery,
              Brigham and Women's Hospital
2000-         Assistant Residency Program Director, Department of Surgery,
              Brigham and Women's Hospital
2001-         Compliance Committee, Department of Surgery, Brigham and
              Women's Hospital
2002-         Brigham and Women's Hospital Disaster Committee
2002-         Clinical Research and Writing Conference, Brigham and Women's
              Department of Surgery

**Presentations:**

1988          "ELISA and Western Blot analysis of human sera from New
              Guinea for the presence of antibody to various human retroviruses
              (HTLV-1, HIV-1 and HIV-2)." Presented at the Annual Student
              Research Awards Day at the NINCDS at the National Institutes of
              Health, Bethesda, MD
1989          "The use of PCR in analyzing tissue samples from patients with
              neurofibromatosis and polymyositis for possible role of human
              retrovirus." Presented at the Annual Student Research Awards
              Day at the NINCDS at the National Institutes of Health, Bethesda,
              MD
1991          "Erythromycin directly stimulates small bowel motility via a non-
              neural, nifedipine-sensitive calcium channel mediated
              mechanism." Presented at: The 1991 Combined Annual Meeting
              of the American College of Surgeons and the Connecticut Society
              of the American Board of Surgeons, Cromwell, Connecticut
1992          "Counter-regulation of a prokinetic calcium-dependent mechanism
              by cAMP dependent agents in isolated segments of terminal ileum
              is non-neurally mediated." Presented at: The 16th Annual Surgical
              Symposium of the Association of VA Surgeons, Albuquerque,
              New Mexico
1992          "Appendiceal Carcinoids in Connecticut: 1935-1986." Presented
              at: The New England Colon and Rectal Surgeon Meeting
1992          "Neuropeptide Y reverses vasoactive intestinal peptide inhibition
              of cholecystokinin-stimulated ileal motility via a Y1 receptor."
              Presented at: The 1992 Combined Annual Meeting of the

|      | American College of Surgeons and the Connecticut Society of the American Board of Surgeons, Cromwell, Connecticut |
|------|------|
| 1992 | "Counter-regulation of the descending inhibitory reflex in intestinal motility." Presented at: The American Colon and Rectal Surgeons Meeting 1992, San Francisco, CA |
| 1993 | "Counter-regulation of ileal motility in rabbits small intestine." Student Research Day. Yale University School of Medicine |
| 1993 | "Does aggressive medical therapy for acute ulcerative colitis result in a higher incidence of staged colectomy?" The 1993 Meeting of the New England Surgical Society, Boston, Massachusetts |
| 1993 | "Redo Nissen fundoplication in children: Indications and outcomes." The 1993 Meeting of the New England Surgical Society, Boston, Massachusetts |
| 1996 | "Extent of smooth muscle resection during mucosectomy and ileal pouch-anal anastomosis affects anorectal physiology and functional outcome." Presented at the 1996 Tripartite Meeting of Colon and Rectal Surgeons, London, England |
| 1997 | "Partial left ventriculectomy improves cardiac hemodynamics in a chronic model of dilated cardiomyopathy." Presented at the 5th World Congress on Heart Failure. Washington , D.C. |
| 1997 | "Partial left ventriculectomy improves cardiac hemodynamics in a chronic model of dilated cardiomyopathy." Presented at the John A. Mannick Research Day, Brigham and Women's Hospital, Harvard Medical School, Boston |
| 1997 | "Partial left ventriculectomy improves cardiac hemodynamics in a chronic model of dilated cardiomyopathy." Presented at the Owen H. Wangensteen Surgical Forum, 52nd Annual Session, 1997 Clinical Congress, American College of Surgeons, Chicago |
| 2001 | "Minor Surgical Procedures" Twenty-Second Annual Office Practice of Primary Care Medicine, March 6, Boston |
| 2002 | "Cushing, the Brigham and the Moseley Dilemma", Grand Rounds, Department of Surgery, Brigham and Women's Hospital, January 13 |
| 2002 | "Minor Surgical Procedures" Twenty-Third Annual Office Practice of Primary Care Medicine, March 7, Boston |
| 2002 | Head and Neck Trauma" 2002 Update in Emergency Medicine, December 4, New Hampshire |
| 2002 | Necrotizing Fasciitis" 2002 Update in Emergency Medicine, December 4, New Hampshire |
| 2003 | "Benign Hepatobiliary Disease" Core Curriculum Conference, Brigham and Women's Hospital, January 29, Boston |
| 2003 | "Minor Surgical Procedures" Twenty-Third Annual Office Practice of Primary Care Medicine, March 20, Boston |
| 2004 | "Small Bowel and Bowel Obstruction" Core Curriculum Conference, Brigham and Women's Hospital, June 23, 2004 |

**Clinical Contributions, Teaching and Research:**

A. Clinical:   As an associate surgeon at Brigham and Women's Hospital, I perform a wide variety of General Surgery cases as well as Trauma cases.  Since 2000, I have averaged over 500 surgical procedures per year, of which 200 are major GI or trauma procedures.  These cases come from my position as a staff surgeon for both Harvard Vanguard Medical Associates and the General and Gastrointestinal Surgery Section of the Department of Surgery at Brigham and Women's Hospital.

As Associate Director of Trauma, I have helped promote the Level I Trauma accreditation at Brigham and Women's Hospital.  Responsibilities include taking primary trauma call at the hospital as well as provide outreach lectures in the community.

B. Teaching:  Since July 2000, I have been the Associate Program director for the General Surgery program at Brigham and Women's Hospital.  Duties include overseeing the residents and dealing with issues regarding their clinical training.  Approximately 40 hours per month are spent teaching residents directly.

I have also been in charge of a weekly intern conference for the past two years.  These conferences have been targeted for the categorical and preliminary interns and are focused for their knowledge level.  Formal teaching on a variety of subjects as well as informal question and answer periods constitute the majority of the time spent with the residents.

For the past eighteen months I have been co-leader of a weekly writing club for the clinical residents.  These meetings have been designed to teach the residents the surgical writing process in the hopes of achieving publication.  Residents are encouraged to think of a paper topic and through these meetings encourage the necessary skills to write a clinical paper for publication in surgical journals.

Finally, in conjunction with Harvard Medical School, I have secured funding for a laparoscopic surgical simulator.  The simulator is used to provide exposure and skill assessment to laparoscopic procedures.  The simulator is currently used in the training of surgical residents as well as to provide exposure to laparoscopic techniques to the core clinical group of third-year Harvard Medical students.  I spend approximately 10 hours per month teaching Harvard Medical students.

C. Research:  I have been an active participant in clinical research with Drs. Francis Moore and Selwyn Rogers both in the Department of Surgery.  Our focus has been directed to the understanding of changes in intestinal viability in trauma as well as critically ill patients.  I have also secured $30,000 of funding from Friends of the Brigham to provide additional equipment in investigating these issues.

In 2001-2002, I was involved in a clinical study looking at the effects of a valved portacatheter placed in patients undergoing chemotherapy to determine their long term function and patency rates compared to standard non-valved portacatheters.

These studies were done in conjunction with the Metabolic Support Service at the Brigham and Women's Hospital.

The 80-hour workweek for surgical residents has come to the forefront of surgical education. In conjuction with the department of Sleep Medicine, I am involved in research looking at the effect of an 80-hour work week and the its relationship to surgical education. Our plan is to study the resident's ability to learn in this new environment and how best to plan surgical curriculum.

Finally, I am the prinicpal investigator looking at the role of a new antibiotic regimen in the treatment of patients with perforated appendicitis. As part of a multicenter trial, I am involved in the coordination and recruitment of identifying patients who may be enrolled as subjects for the study.

**Publications:**

1. Ferzoco SJ, Armstrong DN, Modlin IM, Ballantyne GH. Neuropeptide Y reverses vasoactive intestinal peptide inhibition of cholecystokinin-stimulated ileal motility via a Y1 receptor. Gastroenterol 1992; 102:A448.

2. Ferzoco SJ, Modlin IM, Ballantyne GH Counterregulation of a prokinetic calcium-dependent mechanism by cAMP- dependent agents in isolated segments of terminal ileum.In: J Surg Res (1993 Feb) 54(2):107-14

3. Ferzoco SJ, Becker JM. Does aggressive medical therapy for acute ulcerative colitis result in a higher incidence of staged colectomy? Arch Surg 1994. 129:420-423.

4. Mesana TG, Ferzoco SJ, Reul RM, Sayeed-Shah U, Karamichalis JM, Laurence RG, Schoen FJ, Cohn LH Innovative techniques in skeletal muscle cardiac assistance: first experimental study on minimally invasive aortomyoplasty and cardiomyoplasty.In: ASAIO J (1997 Sep-Oct Sep-Oct) 43(5):M791-6

5. Reul R, Briscoe DM, Ferzoco SJ, Zlotnick AY, Sayeed-Shah U, Karamichalis J, Laurence RG, Cohn LC, Couper GS. Endothelial cell adhesion molecules are induced in native hearts as well as in allografts immediately following heterotopic cardiac transplantation. J Heart Failure 1997; 4: 61.

6. Ferzoco S, Ahmad R, Reul R, Laurence R, Sayeed-Shah U, Karamichalis J, Couper G, Cohn L. Partial left ventriculectomy improves cardiac hemodynamics in a chronic model of dilated cardiomyopathy. J Heart Failure 1997; 4: 186.

7.    Mesana T, Karamichalis J, Sayeed-Shah U, Ferzoco S, Reul R, Laurence R, Cohn LH.  Innovative techniques in skeletal muscle cardiac assistance - experimental study on minimally invasive aortomyoplasty and cardiomyoplasty.  J Heart Failure 1997;  4:160.

8.    Becker JM, LaMorte W, St. Marie G, Ferzoco S.  Extent of smooth muscle resection during mucosectomy and ileal pouch-anal anastomosis affects anorectal physiology and functional outcome. Dis Colon Rectum 1997; 40:653-660.

9.    Ferzoco S, Reul R, Ahmad R, Laurence R, Sayeed-Shah, U, Mesana T, Karamichalis T, Couper G, Coh L.  Partial left ventriculectomy improves cardiac hemodynamics in a chronic model of dilated cardiomyopathy.  The Surgical Forum 1997; XLVII: 281-283.

10.   Mesana TG, Mouly-Bandini A, Ferzoco SJ, Collart F, Caus T, Reul RM, Monties JR, Schoen FJ, Cohn LH Dynamic aortomyoplasty: clinical experience and thoracoscopic surgery feasibility study.   J Card Surg (1998 Jan Jan) 13(1):60-9

11.   Nathan M, Gates J, Ferzoco, S.  Hepatic Duct Confluence injury in blunt abdominal trauma—case report and synopsis on management.  Surg Laparosc Endosc Percutan Tech 2003; 13:350-352.

12.   Genc M, Clancy T,  Ferzoco S, Norwitz E.  Maternal Congenital Diaphragmatic Hernia Complicating Pregnancy.  Surg Gynec Obstet 2003; 102:1194-1196.


**Chapters:**

1.    Ferzoco SJ, Modlin IM.  Laparoscopic Splenectomy.  In Laparoscopic Surgery.  Eds: Ballantyne GH, Modlin IM. Saunders 1994

2.    Ferzoco SJ, Becker JM.  The Acute Abdomen.  In Sabiston Essentials of Surgery (second edition).  Eds: Sabiston DC, Lyerly HK.  Saunders 1994

3.    Ferzoco SJ, Soybel D.  A History of Gastric History.  In: Problems in General Surgery.  Ed: Ashley S.  Lippincott-Raven Publishers, Philadelphia.  1997

4.    Javid S, Ferzoco SJ. Hemorrhoids. In: Encyclopedia of
      Gastroenterology. Ed: Johnson LR. Academic Press 2003.

5.    Hsu C, Ferzoco SJ. Appendicitis. In: Encyclopedia of
      Gastroenterology. Ed: Johnson LR. Academic Press 2003.

6.    Cooper Z, Ferzoco SJ. Hernias. In: Encyclopedia of
      Gastroenterology. Ed: Johnson LR. Academic Press 2003.

**Editorials:**

1.    Ferzoco SJ, Matros E, Ashley SW. Electrical Stimulation for
      Gastroparesis: Wired for success or just wired? JPEN 2003;
      27:386-387.

**Professional Organizations:**

Association of Academic Surgeons
American College of Surgeons, Candidate Group
American Medical Association
Surgical Society of the Alimentary Tract
Eastern Association for the Surgery of Trauma

EXHIBIT 2

## REPORT OF PHILIP C. CARLING, M.D
## PURSUANT TO FED. R. CIV. P. 26(2)(B)

I.    STATEMENT OF THE OPINIONS TO BE EXPRESSED AND THE BASIS
      AND REASONS FOR OPINIONS

I have reviewed the available medical records of Mrs. Chattelle. The following
aspects of Mrs. Chattelle's medical history are of note:

August 27, 1999 – Day Kimball Hospital Emergency Department visit for
abdominal pain of several weeks' duration. The ED note indicates that a prior ultrasound
of the abdomen was unremarkable. The patient was complaining of feeling bloated but
denied nausea, vomiting, diarrhea, fever or chills. On examination she was noted to be
afebrile with a negative abdominal exam. The impression was "?Gastritis". Prilosec was
prescribed and the patient advised to follow-up further with Dr. Mattie.

October 27, 1999 – Day Kimball Hospital – GI consultation and upper GI
endoscopy with biopsies – Patient was admitted to Day Surgery to the Medical Procedure
area for endoscopy. A detailed dictated consultation note by Dr. Raj Eshsharma notes the
patient was undergoing the procedure due to a previous upper GI series which showed
duodenitis with thickening of mucosal folds in the jejunum and proximal loop of illeum.
The note indicates the patient had been complaining of five years of upper abdominal
pain. There was no history of inflammatory bowel disease. The question of a possible
colonic vaginal fistula was apparently raised by the patient having a history of passing
some stool through the vagina when having frequent bowel movements. Laboratory
studies failed to disclose evidence of WBCs in the patient's stool. Total WBC count was
9.1 with a normal platelet count. Amalase was noted to be normal. She was not anemic
with a hematocrit of 40. A prior CT and abdominal ultrasound were noted to be
unremarkable. A Barium enema was reported as not showing evidence of fistula
formation or other pathology. Dr. Eshsharma's note goes on to raise the possibility that
the patient may have some form of inflammatory bowel disease. On an endoscopy,
gastritis and duodenitis were diagnosed visually but multiple biopsy specimens of both
the stomach and the duodenum showed only mild, nonspecific changes.

November 5, 1999 – Day Kimball Hospital. GI consultation with Robert
Flescher, M.D. whose dictated consultation note reviews the patient's history and
unremarkable work up-to-date. The note indicates the patient was still complaining of
vague diffuse abdominal pain with poor localization. Dr. Flescher believed that the
patient's symptoms may have been on a musculo-skeletal basis. Despite this concern he
prescribed Elavil to "inhibit visceral and somatic pain".

July 29, 2000 – Day Kimball Hospital Emergency Department evaluation for
fevers and body aches. The patient presented to the Emergency Department with a
several day history of rather vague body aches with documented fevers to 101 degrees.

The Emergency Department record confirms the patient's work-up was basically unremarkable aside from the fact that her WBC count was slightly elevated to 15,600 with normal differential and normal platelet count. An ESR was noted to be 18. Lyme titre and ANA testing were unremarkable. An EKG was normal and a chest x-ray was noted to be clear. The patient was discharged with plans for further follow-up with Dr. Mattie.

August 28, 2000 – Day Kimball Hospital Outpatient GYN admission under the care of Dr. Leonard Averill. Dr. Averill's dictated note indicates the patient was in the process of being admitted for repair of a recto-vaginal fistula. His note in part states:

> She is unclear as to when the problem started. It was discovered by me in 12/99. She does have a chronic problem with some drainage and a foul odor and she enters today requesting repair. Planned surgery has been discussed with the patient at extreme length. She has been offered no guarantees as to the success. The problem itself is that she has an approximately swab sized connection between the entroitus of the vagina and the rectum. I plan to excise the area and do a repair. She has also had some anal sphincter deficit and I will attempt to correct the anal sphincter.

> On physical exam . . . Genital pelvic – Exam of the vagina shows an approximately swab sized hole somewhat to the left of midline, which is probably secondary to obstetrical trauma.

Dr. Averill's note goes on to document the patient having a family history of diabetes and that she was currently smoking approximately a pack a day of cigarettes.

On September 1st the patient underwent surgical repair of the fistula by Dr. Averill whose operative note in part states:

> Indication: . . . The patient was admitted for repair of her recto-vaginal fistula. She is unclear as to when the problem started. I have noticed this problem, however, when I evaluated her in 12/99. . . . The patient has been followed for this problem for approximately eight months.

Dr. Averill's note goes on to describe the operative procedure and excision of the fistulous tract with primary closure. No evidence of infection or abscesses was noted.

September 9, 2000 – Day Kimball Hospital Emergency Department evaluation for sudden onset of vaginal pain. The dictated Emergency Department note in part states:

> The patient had a recto-vaginal fistula repaired on September 1st by Dr. Averill. Since surgery the patient has complained of constipation and today she states that she has question of stool coming from her vagina while straining on the toilet. Symptoms developed just prior to presentation.

Pelvic exam confirmed the dehiscence of the suture line as well as fecal impaction.

September 11, 2000 – Day Kimball Hospital admission under the care of Dr. Averill for pain control and further evaluation of the recurrent fistula. Physical exam failed to confirm any evidence of infection. Surgical consultation recommended conservative care and the patient was subsequently discharged on pain medications.

In November 2000 she was referred to Dr. Viriato Fiallo, a general surgeon at Baystate Medical Center, in association with a planned recto-vaginal fistula repair procedure.

On the basis of information in the patient's Baystate Medical Center records as well as the record of Dr. Fiallo's evaluation of the patient on November 3, 2000 and Ms. Chattelle's recollections as contained in her deposition, it would appear that the patient developed a recto-vaginal fistula in approximately 1997 or 1998 which led to evaluation and initial surgical repair which took place at a hospital in Connecticut. Due to persistent symptomatology, the patient was subsequently referred to Baystate Medical Center and Dr. Leroy Charles, a GYN surgeon, who in turn referred the patient to Dr. Fiallo for evaluation of an elective diverting colostomy procedure.

On November 3, 2000 the patient was evaluated by Dr. Fiallo, whose office note in part states:

> HPI: . . . Patient states that about a year ago she started having fecal leakage through the vagina . . . The patient does not know why this happened. She never had radiation therapy to the pelvis. She had two children, the younger one being 19 years old now. . . . She is not aware of any trauma to the area during one of her pregnancies. The patient says that for over a year now she has been having pain the left flank. This pain is dull and recurrent. . . . The patient has had bouts of diarrhea, some of them very severe. . . . This summer she had an episode of severe diarrhea with pain and had a temperature of 104 degrees. . . . Attempt to repair the vaginal fistula in September of this year.

> Physical exam: There's a connection between the rectum and the vagina low in the rectum larger in size than a fingertip. No induration of surrounding tissues. No evidence of undrained abscess in the area.

> Impression: 1. Recto-vaginal fistula. I am not quite sure why she has this fistula since she does not recall any obstetric trauma or trauma to the area. The possibilities include inflammatory bowel disease or diverticulitis. The patient has a history of flank pain. I explained to the patient at this point the best thing to do would be to perform a colostomy at the time Dr. Charles repairs the fistula. This will allow the fistula to heal because of lack of contamination with stool and the controlled infection. The procedure can be done using the laparoscopic technique to decrease wound complications and speed up recovery. Six to eight weeks after the procedure once we document the fistula is healed, the colostomy could be

closed. I explained to the patient I would like to do a Barium enema to rule out the possibility of inflammatory bowel disease and also diverticulitis as a source of the fistula.

On December 13th the patient was admitted to Baystate Medical Center for the planned surgery. A resident admission note, although substantially illegible, indicates the patient had a prior appendectomy. The note also appears to indicate that the initial repair procedure failed due to the patient becoming constipated shortly after the procedure.

On the day of admission the patient underwent repair of the recto-vaginal fistula which Dr. Charles described as "large". Following this procedure the patient had a laparoscopic diverting colostomy carried out by Dr. Fiallo whose operative note in part states:

Due to the amount of scar tissue and the potential for failure due to infection, Dr. Charles asked me to perform a diverting sigmoid colostomy to allow the area to heal well before the stools are allowed to pass through the area.

Findings: The patient had a sigmoid that was adherent to the lateral wall, lower abdomen and pelvis. It was also adherent to the infundo pelvic ligament on the left. The sigmoid below the pelvic rim was fairly mobile. A quick exploration of the female pelvic organs showed no abnormalities.

Following surgery the patient made an uneventful recovery and was discharged in stable condition on 7/17/2000.

Following discharge Ms. Chattelle was seen in follow-up by Dr. Charles on December 27th at which time he noted that the patient's incision was healing well.

On December 27th the patient was seen in planned follow-up by Dr. Fiallo whose office note in part states:

The procedure was performed and the patient did not have any postoperative complications. Today the patient still complains of some pain at the site of the incision. Her colostomy has been working well.

Exam : . . . The colostomy looks very good. There is a small area that detached from the skin but there is no infection.

Plan: I talked to Dr. Charles . . . He will be seeing the patient today to see how the fistula repair is healing. Tentatively the procedure (colostomy closure) will be scheduled for the first week in February.

Four days later on December 31, 2000 Ms. Chattelle presented to the Emergency Room at the Baystate Medical Center with pain in her colostomy site. A dictated note by Dr. Gregg McDonald in part states:

The patient states that over the past day or two she has noted redness and questionable discharge at the ostomy site.

Physical examination: . . . The patient's abdomen is noted to show several scars including the laparoscopy umbilical scar, right lower quadrant appendectomy scar, and ostomy in the left lower quadrant with serosanguinous drainage, erythema, induration and question of abscess. The abscess was explored locally, purulence was expressed out of the abscess which was sent for culture and sensitivity.

Subsequently the patient was evaluated with Dr. Benedetto who was covering for Dr. Fiallo and later discharged home on Levoquin and Percocet with plans for further follow-up in the Surgery Clinic.

On January 3, 2001 an Emergency Department follow-up form was completed (signature illegible) which noted that the culture obtained from the abscess grew "four plus staph Aureus, two plus gram negative rods". The note goes on to state:

Unable to locate chart. Spoke with Dr. McDonald. Recommends patient Rxed in ED by surgical resident. Placed on Cipro – susceptible.

Ms. Chattelle was evaluated by Dr. Charles for the last time on January 29, 2001. His progress note of that date indicates that on physical exam the patient had no evidence of residual fistula. Tylenol No. 3 with codeine was prescribed and plans were made for a follow-up visit in two weeks.

There are currently no records of the patient receiving medical care between the time of the follow-up Emergency Department note on January 3rd and Dr. Charles' office note.

On February 1, 2001, Ms. Chattelle was re-admitted to Baystate Medical Center under the care of Dr. Fiallo. On the day of admission the patient underwent reversal of the previous colostomy. Dr. Fiallo's operative note, dictated on the day of surgery, indicates the patient was being electively re-admitted for the planned colostomy closure. The note in part states:

Findings: Before the procedure we inspected the perineal region. A rectal examination was done as well. The recto-vaginal fistula was completely healed. The patient also had good sphincter tone.

The note goes on to indicate the colostomy was freed up without difficulty, the section of bowel which contained the colostomy was ressected and a two-layer end to side astamosis was carried out.

Shortly after noon on the day after surgery the patient developed a fever to 101.8 degrees. Her abdominal exam was unremarkable, she was receiving PCA for abdominal pain and was able to ambulate in the hall.

On February 3rd low grade fevers continued and abdominal pain continued to be a problem. A fever work-up was implemented and the patient was begun empirically on Cefapime at 3 PM.

Examination of the patient on February 4th disclosed evidence of a wound infection and a progress note entered at 9:25 AM (name illegible) documents that staples were removed from the wound which drained a foul smelling "fat necrosis". The note specifically documents that the "fascia was intact". Cefapime was continued.

On February 5th the patient was noted to have moderate foul smelling drainage and was lethargic with abdominal distention. Abdominal tenderness in the right lower quadrant was also observed (nurses notes). She continued to receive PCA analgesia and was noted to have ambulated twice in the hall without difficulty. The nurse's notes document that the patient was able to ambulate to the bathroom without assist.

On the morning of February 6th Dr. Fiallo examined the patient and noted that:

There is redness and induration around the umbilicus drawing. Will explore the wound. Need to rule out fasciitis.

11:55 AM - Wound explored at bedside. Conscious sedation. Total 4 mg. IV Versed and 100 mg. Fantenil. Foul smelling fluid. No fasciitis. Nonviable fat. Irrigated with saline and packed with Kaltostat. Well tolerated.

On the morning of February 7th a resident progress note confirmed improved erythema and induration. Later in the day the patient's antibiotic therapy was changed to Zosyn to broaden coverage.

On the morning of February 8th an increase in the area of erythema around the wound was noted and surgical exploration of the abdominal wall was initiated. Dr. Fiallo's operative note in part states:

Indications: The patient is one week status closure of colostomy. She was noted to have some drainage from the wound about three days after the procedure. The wound was opened and treated with antibiotics. About two days ago we noted foul smelling fluid coming from the wound. Under conscious sedation the wound was re-explored. It was copiously irrigated and aggressive suctioning was performed. We noted infection around the umbilicus and laterally to the original

wound. We continued packing the wound with Telfa pads for approximately 48 hours but noticed that this drainage did not improve despite packing twice a day. She was brought to the Operating Room to determine the source of the problem.

Findings: The patient had necrosis of the fat, fascia and muscle involving the rectus muscle from the muscular insertion to the level of the costal margin. The necrosis also extended and involved part of the external oblique to above the anterior axillary line. The base between the external and internal oblique was easily opened and was full of pus. Subcutaneous infection extended to the midline above the epigastric region and came around the umbilicus. The axrectus muscle appeared to be spared. The rectus muscle below the incision for the closure of the colostomy was also spared. ... Exploration of the abdominal cavity revealed normal bowel with no purulent material or ascites in the peritoneum. ... The anastamosis looked completely intact with no evidence of leakage. Pathological evaluation of tissue removed at the time of surgery confirmed the presence of necrotizing fasciitis. Cultures obtained in the Operating Room showed a light growth of mixed bacterial pathogens including E. coli and enterococcus.

The following day the patient was returned to surgery for further exploration of her wound at which time an additional ressection of damaged tissue was undertaken. Following consultation, Ms. Chattelle underwent further management of her abdominal wall problems by Dr. Timothy Emhoff, a plastic surgeon, whose dictated operative note of February 15th in part states:

Indications: Patient is a 44 year old female who had initially undergone colostomy closure with subsequent wound infection. The wound infection progressed to severe myocitis covering the entire left side of the abdominal wall despite early and aggressive treatment of the infection. She has undergone multiple abdominal wall debridements through several abdominal incisions including the previous midline incision and accessory incisions on the side. The patient has also been treated with aggressive antibiotics and the irradication of infection with good granulation tissue was noted.

Findings: The patient was noted to have approximately 10 x 20 cm. defect. The defect was noted to encompass both muscle and deep fascia. No intra-abdominal infection or process was noted.

Dr. Emhoffs note goes on to describe revision of the fascia to effect a closure of the abdominal wall defect. A graft was also used to assist in closure of the defect.

Over the next several days the patient's course continued to stabilize and she was discharged to a transitional care unit at the Hubbard Hospital charged for further rehabilitative care on February 24, 2001.

Ms. Chattelle was subsequently admitted to the Transitional Care Unit at the Hubbard Hospital. An admission evaluation developed by Deborah Homer, R.N.C., M.S.N., F.P.N. reviews the patient's recent course at Baystate Medical Center and notes that the patient was continuing to complain of some incisional soreness. The note also confirms treatment with IV antibiotics had been completed. Plans for managing the patient's pain medications and implementing rehabilitation activities were outlined.

On March 3, 2001, ten days after admission, the patient abruptly developed left lower quadrant abdominal pain with purulent fecal drainage from her midline scar. She subsequently developed fever to 103 degrees with an elevated WBC count and was transferred to the Emergency Department at the Hubbard Hospital where she was evaluated shortly after midnight on March 3rd by Dr. Luigi Querusio who was on call to the Emergency Department for general surgery problems. Dr. Querusio's assessment was that the patient had developed peritonitis, most probably due to an anastamotic leak. On the morning of March 3rd he carried out an exploratory laparotomy which confirmed the patient to have an anastamotic leak. The operative note indicates that the ostomy scar area was examined and the presence of mesh noted. Dr. Querusio went on to revise a portion of the patient's bowel and perform an end colostomy. Antibiotic therapy with Cefotetan and Flagyl was continued postoperatively.

Following surgery Ms. Chattelle was transferred to the Intensive Care Unit where she gradually stabilized. TPN was implemented and she was kept NPO. Over the next week the patient was followed closely by Dr. Mary Gulla, the internist who had been managing her care while at the Transitional Care Unit, as well as Dr. Querusio. Although she had some pain control problems and had difficulty tolerating oral medications, she made steady progress with no signs or symptoms of persistent sepsis. Postoperative fevers gradually resolved completely several days prior to discharge. Several areas of wound necrosis were debrided on March 14th and the Penrose drains, which were placed in the left lower quadrant during surgery, were removed.

On March 15th the patient was transferred back to the Transitional Care Unit for continuation of parenteral nutrition and rehabilitation. In a discharge summary dictated on March 15th Dr. Querusio concludes by stating that his plans were to:

> Eventually transfer her to a tertiary facility to determine the best way for abdominal wound closure re-establishment of intestinal continuity.

During the next three weeks the patient remained hospitalized in the Transitional Care Unit. She showed a gradual and steady improvement in her functionality. Wound

care was carefully maintained. A follow-up CT scan on March 20th showed postoperative changes but no abscesses or fistulas.

On June 22, 2001 Ms. Chattelle was admitted to the Hubbard Hospital by Dr. Querusio whose admission note discusses the fact that the patient developed a new left lower quadrant discharge related to her previous drain site. A Barium enema confirmed the presence of a fistula from the stapled end of the sigmoid colon which had broken down and expressed itself through the old drain site in the left lower quadrant where the patient previously had a localized abscess. A follow-up CT scan confirmed the presence of a localized fistula without evidence of abscess formation or undrained collections of fluid.

On the day after admission, the patient was taken to the Operating Room where a left lower quadrant abscess was drained and cultured. The area was explored and no evidence of infected mesh was found. Antibiotic therapy with Cefotetan and Flagyl were implemented empirically. The following day the operative cultures confirmed the presence of a light growth of staph Aureus. The patient remained stable and was discharged with plans for VNA care and further antibiotic therapy with Ciprofloxicin later that day.

On July 11, 2001, Ms. Chattelle was readmitted to the Hubbard Hospital because of continued drainage and the suspicion that she may have developed a fistula. Antibiotic therapy was initiated with Rocefin and Flagyl and subsequently modified to Flagyl and Ancef per recommendations by an infectious diseases consultant. A culture showed a light growth of staph Aureus and the patient was discharged on July 16th with plans for continued IV antibiotic therapy at home.

Following discharge, Ms. Chattelle was seen in follow-up by Dr. Querusio on July 16, August 9, August 16 and August 30, 2001. Subsequently she was referred to Dr. Ronald Bleday at the Brigham and Women's Hospital.

On October 10, 2001 Ms. Chattelle was evaluated for the first time by Dr. Bleday whose office note indicates that despite the presence of an ongoing fistula, the patient had been "doing well at home". The note also documents the fact that the patient continued to smoke one pack a day as she had been doing throughout her illness except when hospitalized.

On December 10, 2001, Ms. Chattelle was admitted to the Brigham and Women's Hospital under the care of Dr. Ronald Bleday for revision of her abdominal wall and hernia repair. On the day of admission the patient underwent exploratory laparotomy carried out by Dr. Bleday whose operative report in part describes his ressecting the patient's colostomy and carrying out an N-tube side rectum anastamosis to restore continuity of the patient's bowel. The patient's large ventral hernia was repaired using a

Vicryl B mesh following ressection of several areas of her abdominal wall in order to allow the mesh to fit more regularly.

Although the patient initially did well following surgery, she subsequently developed respiratory distress which remained incompletely explained despite extensive work-up. For several days she remained intubated in the Intensive Care Unit. It was subsequently noted that several areas of the patient's abdominal wall wounds were not healing well and had become necrotic. These areas were ressected and it was specifically noted that the necrosis was not associated with recurrent infection.

On January 17, 2002, Ms. Chattelle was readmitted to the Brigham and Women's Hospital under the care of Dr. Karl Breuing for plastic surgical revision of her abdominal wall wound. Dr. Breuing's operative note of January 22nd in part states:

> Indications: The patient is a 45 year old female who has had multiple abdominal surgeries and recently had undergone colostomy take-down attempted ventral hernia repair by Dr. Bleday. In the postoperative phase the cutaneous and subcutaneous layers, however, had separated whereas the abdominal wall itself has maintained closure. The wound initially was treated with dressing changes, however, then became colonized and infected.

Dr. Breuing's note goes on to describe removal of the previous vacuum drainage and debridement of the wound, particularly the right upper and right lower quadrants where the need to debride febrinous tissue was particularly commented on. It was also noted that the patient had a 5 cm. defect where the colostomy previously had been in her left upper quadrant which revised to allow for future skin grafting. Three days later the 12 by 18 cm wound was revised, covered with a skin graft and bolstered by reapplication of a vacuum dressing device. On January 28, 2002, the patient was discharged for further follow-up under the care of the visiting nurses.

Beginning in mid July, 2002, Ms. Chattelle began to receive primary care medical support from Dr. Lau at Woodstock Medical Group. The initial comprehensive patient visit note outlines the patient's prior surgical problems and alludes to ongoing issues with her abdominal wall and back symptomatology. At the time the patient had been continuing to smoke one pack a day of cigarettes. It was noted that her weight was 140 pounds and that she was 5'4" tall. It was also noted that the patient had recent onset of diabetes which was treated with oral hypoglycemic medication.

On January 23, 2003, Ms. Chattelle was evaluated by Dr. Lena Yanushpolsky at the OB-GYN Clinic to whom she was referred by Dr. Bleday for a possible hysterectomy prior to further surgical intervention. Although several aspects of the patient's history as noted in Dr. Yanushpolsky's note are not consistent with the currently available records, it is of note that the entry in part states:

She had several skin grafts on her abdominal wall and is wearing a total lower abdominal binder. Dr. Breuing is currently contemplating the next phase of her repair which may involve catavaric tissue or mesh.

On March 17, 2003, Ms. Chattelle was readmitted to the Brigham and Women's Hospital under the care of Dr. Breuing for elective laparotomy to further stabilize her lower abdominal wall. On the day of admission the patient underwent a bilateral salpingo-oophorectomy performed by the GYN service followed by a subcutaneous mesh reinforcement of her abdominal wall performed by Dr. Breuing (latter operative report not found in the currently available records). Following surgery the patient did well and she was discharged in stable condition on March 24, 2003.

The patient was evaluated in July, 2003 by Dr. Lau. These records confirm that the patient had a history of pre-existing back problems confirmed by an MRI in 1999 which showed a bulging disc at T9. This note also indicates the patient discontinued cigarette consumption at some point in 2002 and that her diabetes was in good control. Over the next two years the patient continued to be followed on an episodic basis by Dr. Lau.

On March 8, 2004, Ms. Chattelle was again admitted to the Brigham and Women's Hospital under Dr. Bleday's care for surgical repair of her pelvic floor musculature due to ongoing anal sphincter and pain problems. Following operative revision of her pelvic floor and repair of pelvic musculature on March 8th, the patient subsequently did well and was discharged in stable condition on March 18th.

A follow-up note by Dr. Bleday on September 16, 2004 in part states:

The patient is now several months out from pelvic floor repair. She now has more or less control of her bowel movements and does quite well, however, has significant discomfort with regard to her abdominal wall weakness. ... Most of her complaints are secondary to functional musculo - skeletal imbalance along her spine since her anterior rectus abdominal wall stabilizers are entirely missing. The patient utilizes her axillary truncal muscles very inefficiently. I think would reap the benefit from expert physical therapy education and training in how to use her musculature more effectively. ... The patient unfortunately still focuses on the prominence of her abdomen, giving her other problems. ... I told her that I would not perform any abdominal tightening on her before the overall musculo - skeletal status and situation of her truncal stabilizers had significantly been improved.

On November 18, 2004, Ms. Chattelle was evaluated by Dr. Lynn Thomas, a gynecologist at the Day Kimball Hospital OB/GYN Center for Sexual Dysfunction. Dr. Thomas' detailed dictated note indicates the patient most probably had both

psychological and functional reasons for her sexual dysfunction problems. Although not explained in the body of the note, Dr. Thomas' impression was:

> Impression No. 1 - Sexual dysfunction and would appear that quite a bit of this is due to the relationship.

Dr. Thomas' consultation report goes on to recommend several physical therapeutic interventions as well as counseling for the patient and her husband.

On July 27, 2005 an MRI of the patient's lumbar spine was carried out in the Radiology Department of the Day Kimball Hospital. The study revealed evidence of:

> Some degenerative dessication and loss of height of the L3-4 and L4-5 intervertebral discs.... There is a mild diffuse disc bulge/osteophyte complex, which combines with probable underlying congenital short peticoles to produce a mild spinal stenosis (noted for both L3-4 and L4-5).

Note: A review of Ms. Chattelle's employment records at Moldex Corporation between 1992 and July, 1995 notes the patient had problems with back pain but no other issues were commented on which might in any way relate to her subsequent problems.

On August 1, 2005, Ms. Chattelle was readmitted to the Brigham and Women's Hospital under the care of Dr. Breuing for revision of her lower abdominal ventral hernia which had recurred. At the time of surgery, the patient was found to have a 20 by 30 cm. recurrent ventral hernia for which Dr. Breuing's operative note describes an extensive revision and reconstruction of the abdominal wall using further mesh. It is also noted that the previous colostomy site had also required revision and repair. No operative or intra-operative complications ensued and the patient was discharged in stable condition on her fifth postoperative day.

The patient's last follow-up visit with Dr. Breuing documented in the currently available records took place on January 12, 2006. Dr. Breuing's note of that date indicates the patient was still complaining of mid to lower back pain which was found to be associated with a CT confirmed L3-4 and L4-5 lumbar disc degenerative tear. The note goes on to document his recommendation that the patient be evaluated by a neurosurgeon to determine whether or not surgical intervention would be of benefit. In this context the note goes on to state:

> At this point, do not think that her discomfort has to do with anything inside or outside the abdomen, given the fact that she has undergone a complete tissue lysis and overall intra-operative findings during the last procedure have been surprisingly normal.

At the time of the patient's last documented follow-up visit with Dr. Lau in January, 2006, it was noted that an MRI had recently shown degenerative disc disease at L3-4 and L4-5.

On March 15, 2006, Ms. Chattelle was evaluated in the Emergency Department at the Day Kimball Hospital with flank pain and dysuria. She had clinical evidence of early pyelonephritis with a negative ultrasound but positive urinalysis for leucocytes. She was treated with Levoquin and discharged for further follow-up with her primary care physician. Other than noting the patient's past medical history of her previous surgeries, no discussion of the patient's abdominal wall back problems is described in the records. Subsequently a CT scan performed on March 20, 2006, showed evidence of a possible 2 to 3 mm calcification near what may have been the right ureteral vessicle junction. Positive identification as a ureteral stone could not be made.

## ASSESSMENT OF THE CARE PROVIDED FROM AN INFECTIOUS DISEASES PERSPECTIVE

Based upon the above information, as well as my education, training and experience it is my opinion that Dr. Fiallo complied with the standard of care of the average qualified physician, practicing in his specialty from an infectious disease perspective from November 2000 to March 3, 2001. Based upon the above information, as well as my education, training and experience, it is my opinion that nothing Dr. Fiallo did or is alleged not to have done caused or contributed to the patient's alleged injuries or subsequent medical course or complications. My opinions are held to a reasonable degree of medical certainty. On the basis of a review of the medical records and depositions, it is my opinion that the care Ms. Chattelle received from Drs. Fiallo and Querusio was in keeping with good and acceptable medical practice from an infectious diseases perspective. Most importantly the patient's voluminous records provide clear and highly objective documentation that nothing Drs. Fiallo or Querusio did or avoidably failed to do adversely impacted the patient's problems and need for extensive reconstructive surgery. The basis for the above opinions include the following:

Although Ms. Chattelle's currently available medical records fail to clarify the etiology of her recto-vaginal fistula, it is most likely that it occurred as a result of trauma sustained during the vaginal delivery of her son many years previously.

Given the patient's lack of a history of inflammatory bowel disease, three negative pre-operative Barium enemas between November, 2000 and 2003 which failed to disclose any evidence of either inflammatory bowel disease, diverticular disease or other intra-abdominal pathology and her not having had prior surgery in the area, I believe it is likely that the recto-vaginal fistula developed as a consequence of a breakdown of a longstanding area of damaged tissue which the patient developed as a result of the vaginal delivery she had had approximately eighteen years prior to developing the fistula.

It is also important to note that although the patient had prior abdominal surgery in association with an appendectomy, there is nothing in the records which would in any way suggest that the prior surgery had anything to do with her developing the recto-vaginal fistula, particularly given the fact that the fistula developed in a site anatomically quite distinct from where complications from appendicitis would be expected to occur.

Given the patient's clinical course as we currently understand it prior to her transfer of care to Baystate Medical Center in the late fall of 2000, it is unlikely that the fistula was ever associated with localized infection but merely occurred as a result of the breakdown of vaginal scar tissue which must have adhered to the patient's colon in such a way as to cause a weakening of the area and the development of a moderate sized fistula. Furthermore, it is important to note that there is nothing in the patient's records which would in any way suggest that the fistula was causally related to the development of necrotizing fasciitis of her abdominal wall in February, 2001 or the anastamosis associated fistula which developed after she was discharged from Baystate Medical Center later in 2001.

While I would defer to a surgeon or a gynecologist on the issue, I believe it is likely that all aspects of the care the patient received from Dr. Charles and Dr. Fiallo during her December, 2000 elective surgery and subsequent hospitalization were completely in keeping with good and acceptable medical practice.

Although Ms. Chattelle developed an MRSA associated ostomy site abscess in late December, 2000 which was treated with local drainage and a course of antibiotic therapy, there is nothing in the patient's subsequent records which would in any way suggest that the development of this problem impacted her subsequent course.

While Ms. Chattelle apparently did not seek further medical care between early January, 2001 and the time of her elective admission to Baystate Medical Center on February 1st, there is nothing in the patient's subsequent records which would suggest that she had any pre-existing problem in early February which would have predisposed her to developing severe necrotizing fasciitis of her abdominal wall.

While the patient was subsequently found to have mild adult onset type diabetes almost two years after her elective colostomy reversal and was moderately obese, neither of these issues can be causally related to her development of necrotizing fasciitis and myonecrosis as a postoperative complication in early February, 2001.

Given the patient's clinical course and the findings at the time of her February 8th surgery, it is likely that Ms. Chattelle developed necrotizing fasciitis as an unfortunate, unexpected and unpreventable complication of the colostomy reversal

procedure. The development of necrotizing fasciitis was in no way caused by any improper or negligent conduct.

On the basis of the information contained in the patient's Baystate Medical records between the time she developed a fever to 101.8 on the afternoon of the first postoperative day and the time of her abdominal exploration on February 8th, it appears likely that she developed superficial skin necrosis, as well as a localized infection of the subcutaneous fat at the laparotomy wound shortly after surgery. Given the well documented information in the records, it was completely reasonable and appropriate to empirically implement antibiotic therapy following direct evaluation of the patient at the time it was done.

It is most important to note that during the week prior to the occult deep wound being diagnosed, the records clearly document the careful ongoing and repeated evaluation the patient received from the resident physicians as well as Dr. Fiallo. In the context of the patient's subsequent problems, it is important to note that direct examination of the wound on the morning of February 4th confirmed the presence of fat necrosis, which would have completely explained the patient's low grade fevers and local symptomatology. Since she had only begun to receive antibiotics less than twenty-four hours previously, it was understandable that the wound had not yet begun to show evidence of healing. It is also important to note that the deep recesses of the wound were directly examined and the fascia was noted to be intact, which precluded the deep wound being related to the superficial wound.

On February 5th the patient continued to be stable overall with evidence of only a superficial wound infection and fat necrosis.

Given the failure of the patient's wound to show steady resolution by February 6th after two days of local wound care and antibiotic therapy, it was highly appropriate for Dr. Fiallo to more thoroughly examine the patient's wound using conscious sedation.

Given the fact that further fat necrosis was documented and debrided and the fascia was again noted to be intact, it was completely reasonable and appropriate for Dr. Fiallo to continue the patient's previous management. Indeed, the resident note developed twenty-four hours later on the morning of February 7th confirmed that the patient's wound area had shown improvement following the treatment she received from Dr. Fiallo the previous day.

All aspects of the patient's management on February 8th were highly appropriate.

When Dr. Fiallo noted that the erythma surrounding the wound had increased on the morning of February 8th, he appropriately became concerned that the patient's

infection was not responding adequately to antibiotic therapy. Subsequently the patient was taken to the Operating Room where it was determined that a fairly extensive infection which included myonecrosis had evolved underneath the previously intact fascia.

Although I would defer to a surgeon regarding the technical aspects of the surgery performed on February 8th all aspects of the patient's management from an infectious diseases perspective were carried out in a most expedient and completely appropriate manner.

All aspects of the care the patient received at Baystate Medical Center during the two weeks following her February 8th surgery were completely reasonable and appropriate from an infectious diseases perspective.

Although Ms. Chattelle required re-exploration of her wound on several occasions as well as partial repair of her abdominal wall musculature defect with a mesh graft by Dr. Emhoff, the patient's records clearly document that she had a slow but completely uncomplicated recovery from her deep abdominal wall infection. While it was impossible to achieve complete closure of the patient's abdominal wall wounds due to the extensive amount of surgery which had been performed, by the time of discharge the patient's wounds were substantially healed and free of any evidence of infection.

The patient's necrotizing fasciitis and myonecrosis developed as a rare, unpredictable and unpreventable consequence of the colostomy reversal procedure independent from the superficial wound infection and fat necrosis. The development of this infection was in no way caused by any improper or negligent conduct. The basis for the above opinions includes the following:

The patient's clinical course between February 1st and February 8th;

The clear and objective documentation of significant and ongoing necrosis of the patient's subcutaneous fat;

The fact that the patient's fascia was noted to be intact at the time the wound was evaluated on February 5th as well as the fact that Dr. Fiallo found no evidence of fascial damage or fasciitis on February 6th at the time the patient's wound was explored under conscious sedation;

The patient's improvement on February 7th; and

The finding of extensive spread of infection along the fascial planes in the patient's abdominal musculature beneath the previously intact fascia on February 8th.

It is my opinion to a high degree of medical certainty that Ms. Chattelle actually had two infectious processes going on at the same time during her postoperative period, i.e., a superficial wound infection in the subcutaneous fat with resultant fat necrosis as well as occult deep necrotizing fasciitis and myonecrosis which, although partially suppressed by the antibiotic therapy the patient was receiving for her superficial wound infection, nonetheless spread to become the severe and extensive infection described in the operative note of February 8th.

Given the fact that the patient's clinical course, from an infectious diseases perspective, between February 2nd and February 7th was reasonably and completely explained by the superficial wound infection and fat necrosis, I believe that there is nothing which would in any way suggest that Dr. Fiallo should have been concerned that the patient also had a deep, slowly evolving necrotizing fasciitis problem until her clinical course abruptly changed as of the morning of February 8th.

Furthermore, necrotizing fasciitis following elective abdominal surgery represents a completely unpreventable complication of bowel surgery.

It is also my opinion that, although Ms. Chattelle developed peritonitis due to an anastamotic leak ten days after admission to the Hubbard Rehabilitation Unit and almost a month after undergoing surgery for necrotizing fasciitis, it was highly unlikely that the anastamotic leak was in any way related to the previous development of fasciitis and myonecrosis. The basis for the above opinions includes the following:

> The fact that the patient's clinical course between February 3rd and 8th as well as the findings at the time of the February 8th surgery clearly document that she had no evidence of intra-abdominal infection and that her anastamosis was intact and healthy appearing at surgery;

> Her clinical course at Baystate Medical Center over the ensuing weeks;

> Her course a Hubbard Rehabilitation Center;

> Dr. Querusio's findings at the time of surgery on March 3rd.

That Mrs. Chattelle developed post-operative wound infection and necrotizing fasciitis was an unfortunate, unexpected an unpreventable complication of the colostomy reversal procedure. There is no evidence that there was any negligent conduct or that any negligent conduct caused or contributed to the development of post-operative infection with Mrs. Chattelle. There was no delay in the treatment of the post-operative infection. Dr. Fiallo performed the appropriate evaluations and treatment. Other than what was performed, there was no need for further diagnostic testing or surgery. The patient was

appropriately discharged to a transitional care center in stable condition.

It is my opinion that Dr. Fiallo complied with the standard of care of the average qualified physician practicing in his specialty from an infectious disease perspective. It is my opinion that nothing Dr. Fiallo did or is alleged to have done caused or contributed to any worsening of Mrs. Chattelle's medical condition, subsequent medical complications, treatment or surgery. It is my opinion that her subsequent medical complications and condition are merely an unfortunate medical result and in no way associated or caused by any negligent conduct.

I also expect to present testimony generally regarding post-operative infections, necrotizing fasciitis, and peritonitis and specifically how these matters relate to the instant case and the anatomy involved.

I also expect to refute the opinions of Dr. Dolin as identified in his letters.

I also expect to present expert testimony regarding the plaintiff's medical history and subsequent treatment as detailed in the medical records that have been obtained.

II.    DATA OR OTHER INFORMATION CONSIDERED IN FORMING THE OPINIONS OUTLINED ABOVE

My testimony and opinions are based on my education, training and experience, as well as my review of following records:

> Office records from Dr. Fiallo (Pioneer Valley Surgical Associates)
> Records of Baystate Medical Center
> Records of Hubbard Regional Hospital
> Records of Brigham and Women's Hospital
> Office records from Ronald Bleday, M.D.
> Office records from Valley Women's Health Group
> Records of Tri-State Rehabilitation Center
> Records of Moldex
> Records of Social Security Services Disability Claims
> Records of Dr. Lau (Woodstock Medical Group)
> Letters from Bernard Dolin, M.D.
> Deposition transcript of Dr. Fiallo
> Deposition transcript of Dr. Querusio
> Deposition of Rosemary Chattelle
> Defendants' Answers to Interrogatories
> Plaintiffs' Answers to Interrogatories
> Records of Visiting Nurse Association of Southern Worcester relating to the patient's care between August 1, 2005 and August 4, 2005

Records of VNA of the patient's care between March 25, 2003 and April 2, 2003
Records of the VNA of Southern Worcester County of the patient's care between August 6, 2005 and August 25, 2006

III.  **ALL EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR THE OPINIONS OUTLINED ABOVE**

Other than the records identified in Section II above, a determination has not been made as to what, if any, additional exhibits may be used as a summary of or to support my opinion. I reserve the right to review and identify any additional materials that may be used at trial in this matter by any party.

IV.  **THE QUALIFICATIONS OF THE WITNESS, INCLUDING A LIST OF ALL PUBLICATIONS AUTHORED WITHIN THE LAST TEN YEARS**

Please refer to my curriculum vitae attached hereto as an exhibit.

V.  **THE COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY**

My fee is $330.00 per hour for time spent reviewing and evaluating medical records. My fee is $380.00 per hour for the time spent testifying at trial.

VI.  **A LISTING OF OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT WITHIN THE PRECEDING FOUR YEARS**

Although I have not kept specific records of my testimony, I estimate that I have testified as a medical expert for defendants and plaintiffs approximately twice a year at deposition and approximately three to four times a year at trial during the past several years. Recent cases in which I recall testifying at trial or deposition during the past 18 months include: Boudreau v. Cybex International, Inc., 3/06; Marcelli v. Ramdin, 2/06; Roy v. Tenney, 2/06; Howell v. Medical Faculty Associates, 1/06; Donahue v. Beaton, 12/05; Arsenault v. Espinosa, 12/04; Morgan v. Barlam, 2/04; Jordan v. Murray, 4/04.

I have testified in other cases within the last four years, but I do not recall the names of the cases. I am in the process of determining the identity of additional cases in which I have testified as an expert in the last four years.

_____

Dated: _July 12 2006_____

# CURRICULUM VITAE

## Philip C. Carling, M.D.

Office:
Department of
Hospital Epidemiology
Carney Hospital
2100 Dorchester Ave.
Boston, MA 02124
Phone: 617-296-4000 Ext. 5050
Email pcarling@cchcs.org

Residence: 53 Tower Rd.
Hingham, MA 02043
Phone: 749-3637

**Personal Data:**

Born: June 20, 1943 in Staten Island, New York
Wife: Isabel, Born in New York City, New York
Daughters:   Jennifer – Age 34
Laura   - Age 30

**Education:**

B.S.      1965 University of Dayton, Dayton, Ohio

M.D.      1969 Cornell University Medical College, New York, N.Y.

## Internship:

1969-1970
Internal Medicine , Boston University Hospital
Evans Memorial Service, Boston, Massachusetts

## Residency:

1973-1974
Internal Medicine, Boston University Hospital
Evans Memorial Service, Boston, Massachusetts

## Fellowship:

1972-1973
1974-1975
Clinical and Research Fellowship in Infectious Diseases
Boston University Medical Center & Affiliated Hospitals
Boston, Massachusetts

## Military Service:

August 1970 to
July, 1971
United States Naval Support Forces, Republic of Vietnam

August 1971 to
July, 1972
United States Naval Hospital, Philadelphia, Pennsylvania

**Professional Societies:**

> Society for Hospital Epidemiologists of America
> Society for Research and Education in Primary Care Internal Medicine
> American Federation for Clinical Research
> Society of Hospital Epidemiologists of America
> American Society for Microbiology
> Massachusetts Medical Society
> Alliance for the Prudent Use of Antibiotics

## Certification:

| | |
|---|---|
| 1973 | American Board of Medicine |
| 1975 | American Board of Infectious Diseases |

## Elected Membership:

October 1979  Infectious Disease Society of America, Member

## Medical School Appointment:

1975 – present       Assistant Professor of Medicine
                     Boston University School of Medicine

## Hospital Appointments:

Carney Hospital;  Boston, Massachusetts

1975 – 1983    - Director, Infectious Diseases Section, Department of Medicine
1987 – present

1975 – 1982    - Hospital Epidemiologist & Chairman, Infection Control Committee

1975 – present - Visiting Physician, Consultant in Infectious Diseases and
                     Internal Medicine

1977 – present - Clinical Director, Microbiology Laboratory

1980 – 1981    - Acting Director, Department of Medicine
1981 – 1990    - Director, Department of Medicine and Physician-in-Chief
                     - Director, Internal Medicine Training Program
                     - Director, Transitional Training Program

Boston Medical Center: Boston, Massachusetts
1995 – present          - Consultant in Infectious Diseases and Attending
                          Physician, I.D. Consultation Service.

Milton Hospital: Milton, Massachusetts
1975 – 1990          - Consultant in Infectious Diseases

South Shore Hospital: Weymouth, Massachusetts
1975 – 1983          - Consultant in Infectious Diseases

Quincy Hospital: Quincy, Massachusetts
1995 – present          - Consultant in Infectious Diseases
1996 – present          - Director of Infectious Diseases

HealthSouth Braintree Rehabilitation Hospital: Braintree, Massachusetts
1995 – present          - Consultant in Infectious Diseases
1998 – present          - Director of Infectious Diseases

The Rehabilitation Hospital of the Cape and Islands
 Sandwich, Massachusetts
2002 – Present          - Consultant in Infectious Diseases

**Licensure:**    Massachusetts

**Epidemiology:**

1975 – 1982          Director of  Hospital Epidemiology,  Carney Hospital
1987 – present
1996 – present          Director of Hospital Epidemiology, Quincy Hospital
1999 – present          Director of Hospital Epidemiology, Braintree Hospital
2002 – present          Director of Hospital Epidemiology, The Rehab Hospital of the
                          Cape and Islands

**Carney Hospital Committees:**
1975 – present          Chairman Infection Control Committee
1975 – 1995          Medical Record Audit and Quality Assurance Ct.
1975 – present          Pharmacy Committee
1978 – 1987          Strategic Planning Committee
1978 – 1991          Laboratory Committee
1980 -  1990          Medical Executive Committee
1980 – 1990          Development of Hospital Services Committee

**Editorial Review Boards:**

>Clinical Infectious Diseases
>Journal of General Internal Medicine
>Infection Control and Hospital Epidemiology

**Grants:**

Project Director:

| | |
|---|---|
| 1984-187 | "Primary Care Training in Internal Medicine", |
| 1987-1990 | "Implementation of the Primary Care Residency", |
| 1990-1993 | "Expansion of Primary Care Training into the Community" DHEW  $648,250. No. 5-D28PF 11105-07. |

**Editorial Review Boards:**

>Clinical Infectious Diseases
>Journal of General Internal Medicine

>Infection Control and Hospital Epidemiology

**Editorial Review Boards:**

>Clinical Infectious Diseases
>Journal of General Internal Medicine

>Infection Control and Hospital Epidemiology

**Editorial Review Boards:**

>Clinical Infectious Diseases
>Journal of General Internal Medicine

>Infection Control and Hospital Epidemiology -07.

**American Board of Internal Medicine:**

Special Consultant to the Office of the President; 1986, 1988, 1990.

**Massachusetts Hospital Association:**

Special Consultant for the development of policies and procedures
Related to Blood Borne Pathogen Safety in hospitals – 1992.
AIDS Task Force – Appointed Member 1992 – 1995.

**Tufts Health Plans:**

>   Special Consultant in Infectious  Diseases and HIV Patient
>       Care Management 1995 – Present.

**Massachusetts Department of Public Health**

>   Special Consultant to the office of the Chief Medical Officer.
>       September- December 2004.

**Awards:**

>   William A Rutala Research Award – June 2004 – Presented by the Board of
>   Directors of the Association for Practitioners in Infection Control for
>   "Original research of major importance representing a potentially
>   significant scientific contribution to the field of disinfect ion, sterilization
>   and antisepsis."

>   Blue Ribbon Abstract Award - June 2004 - The 31st Annual Meeting
>       of  The Association of  Infection Control Practitioners.

>   Blue Ribbon Abstract Award  - April, 2005,  The Fifteenth Ann. Scientific
>       Meeting of The Society for Healthcare Epidemiology of America

**PUBLICATIONS:**

1. Carling, PC Johns MA, McCabe WR: Activity of Antibodies to Cross-Reactive
   Antigens of Enterobacteria.  Abstr. Am Fed Clin Research 1973.

2. Carling, PC, Casana AA, Alexander EA, Idelson B, McCabe WR: Nephrotoxicity
   Associated with Cephalothin Administration.  Arch Int Med 135: 797, 1975.

3. McCabe WR, Carling PC, Bruins S, Greely A: The Relation of K-antigen to
   Virulence Of Escherichia Coli.  J Inf Dis 131: 6 – 10, 1975.

4. Kreger BE, Creven DE, Carling PC, McCabe WR: Gram Negative Bacteremia
   AM J Med 68: 332-342, 1980.

5. Carling,  PC, Kearney, GP, Fournier's Gangrene: An Approach to Its Management.
   The Journal of Urology 130 695 – 698, 1982.

6. Carling, PC, Fung TK, Coppola, PG, O'Donnell FP, The Use of a Standardized
   Antibiotic Monitoring Program to Document Cost Savings: Clinical Infectious
   Diseases 17 547, 1993. (Abstr.)

7. Coppola P, Carling PC, Fung T, Pharmacy – <u>Infectious Diseases Antibiotic Utilization Program – Use in a Community Hospital</u> American Society of Hospital Pharmacists – Abstracts of the 28th National Meeting <u>28</u> 149, 1993.

8. Carling P, Fung T, Coppola PG, - <u>Evaluation of Antibiotic Use Between Hospitals Using a Standardized Monitoring Program</u>. Infection Control and Hospital Epidemiology <u>16</u> P36, 1995.

9. Carling P, Hayward K, Coakely E, Wolf A, <u>Part-Time Residency Training in Internal Medicine – Analysis of a Ten Year Experience</u>. Academic Medicine <u>74</u> 282, 1999.

10. Carling, P, Fung T, Coldiron J. <u>Parenteral Antibiotic Use in Acute Care Hospitals: A Standardized Analysis of Fourteen Hospitals</u>. Clinical Infectious Diseases <u>29</u> 1189-96. 1999.

11. Carling, P. <u>Communication.</u> Clinical Infectious Diseases 2001 <u>32</u> 1519.

12. Carling P. <u>Review Blackwell' s Primary Care Essentials: Travel Medicine</u>. Smith, R, Sears S Onion D. Annals of Internal Medicine, 2002 <u>137</u> 554.

13. Ross JR, SaltzmanCL, Carling PC, Shapiro DS. <u>Pneumococcal Septic Arthritis: Review of 190 Cases Clinical Indectious Diseases 2003 ; 36: 319-27.</u>

14. Carling P,Fung T, Killion A, Terrin N, Barza M. The <u>Favorable Impact of an Antibiotic Management Program Conducted over Seven Years.</u> Infection Control and Hospital Epidemiology 2003 <u>24</u> 699-706.

15. Carling P, Briggs J, Perkins J, Hylander D. <u>An Evaluation of Patient Area Cleaning in Three Hospitals Using a Novel Targeting Methodology</u>. American Journal of Infection Control. In – Press.

16. Carling P, Briggs J, Perkins J, Hylander D. <u>Improving Cleaning of Patient Rooms Using a New Targeting Method.</u> Clinical Infectious Diseases, 2006;42:385-8.


**Presentations at National Meetings:**

April 13, 1992 – <u>The Impact of COl Approach on Safe Disposal of Contaminated Needles and Needle Stick Accidents</u>.
Annual Meeting of the Society of Hospital Epidemiologists
Of America.  Baltimore, Maryland.

October 15, 1993 – <u>The Use of a Standardized Antibiotic Monitoring Program to
Document Cost Savings</u>:
Annual Meeting  of the Infectious Diseases Society
Of America.  New Orleans, Louisianna.

April 5, 1994  - <u>The Impact of an Ongoing Monitoring Program on Contaminated
Sharps Injuries in Nurses.</u>
The Third International Conference on the Prevention
Of  Infection.  Nice, France.

April 3, 1995     <u>Evaluation of Antibiotic Use Between Hospitals Using
A Standardized Monitoring Program</u>
Annual Meeting of the Society for Health Care Epidemiology
San Diego, California

May 2, 2000     <u>Antibiotic Management Issues and Resistance Issues</u>
Antibiotic Resistance and Infections Conference
Needham, Massachusetts.

September 25, 2000 - <u>Antibiotic Use in Acute Care Hospitals</u>
National Managed Healthcare Congress
Boston, Massachusetts

September 20, 2000 - <u>The Favorable Impact of a Multidisciplinary Antibiotic
Management Program Analyzed over Seven Years.</u>
40th Interscience Conference on Antimicrobial Agents
and Chemotherapy, Toronto Canada

February 20, 2002.  – <u>Controlling Antibiotic Resistance in Hospitals.</u>
2002 FDA Science Forum. Washington, D. C.

April 19, 2004  -     <u>A Prospective Evaluation of Patient Room Cleaning in two
Hospitals Using a Novel Targeting Methodology.</u>
The Fourteenth Annual Scientific Meeting of
The Society for Healthcare Epidemiology of America,

June 6, 2004 -     <u>A Novel Method of Evaluating the Effectivness of Environmental
Cleaning/Disinfecting in Healthcare Facilities.</u>
The 31st Annual Meeting of  The Association of
Infection Control Practitioners.

November 2, 2004    <u>An Evaluation of Patient Room Cleaning in Three Intensive Care</u>
<u>Units Using a Novel Targeting Methodology</u>.
44th Interscience Conference on Antimicrobial Agents and
Chemotherapy, Washington D.C.

April 10, 2005    <u>Improving Terminal Cleaning of Patient Care Rooms using a</u>
<u>Model Targeting Methodology in Three Hospitals</u>
The Fifteenth Annual Scientific Meeting of
The Society for Healthcare Epidemiology of America

June 20, 2005    <u>Improving Patient Room Cleaning in two Intensive Care Units</u>
<u>Using a New Targeting Methodology</u>
32nd Annual Educational Conference and International
Meeting, The Association for Practitioners in Infection
Control. Baltimore, Maryland